Slip Op. 20-68

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **THE KALENCOM CORPORATION,** | |
| Plaintiff, | |
| v. | **Before: Timothy M. Reif, Judge** |
| **UNITED STATES,** | **Court No. 15-00011** |
| Defendant. | |

### <u>OPINION</u>

[Denying plaintiff's Rule 56 motion for summary judgment and granting defendant's Rule 56 cross-motion for summary judgment.]

Dated: May 18, 2020

<u>Peter J. Fitch</u>, Fitch, King, LLC of Monmouth Beach, N.J., argued for plaintiff.

<u>Monica P. Triana</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of New York, N.Y. and <u>Alexandra Khrebtukova</u>, U.S. Customs and Border Protection, argued for defendant.  With them on the brief were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Amy M. Rubin</u>, Assistant Director, International Trade Field Office, and <u>Marcella Powell</u>.

Melanie (played by Reese Witherspoon), in a darkened space: "Andrew, are you on some sort of medication?  What's going on?  Where are we?"  The lights brighten slightly to reveal that Melanie and Andrew are inside the main floor of Tiffany's Fifth Avenue: "Oh, my God . . . Oh, my God . . . Oh, my God."

Andrew (Patrick Dempsey), getting down on his knees: "Melanie Carmichael . . . will you marry me?"

Melanie: "Are you sure?  I mean, a-a-are you really sure?  Because if you're not sure, we could just go back to the car.  It's only been eight months, Andrew — "

Andrew, standing: "You know I never do anything rash.  And I usually never ask a question I don't already know the answer to . . . so . . . at the risk of being rejected *twice*, I'm gonna ask you again.  Will you marry me?"[1]

* * *

Reif, Judge: At issue in this case is the classification of several different styles of jewelry boxes imported by The Kalencom Corporation ("Kalencom" or "plaintiff") into the United States.  Plaintiff challenges a decision by United States Customs and Border Protection ("Customs") to classify the jewelry boxes under subheading 4202.92.90 of the Harmonized Tariff Schedule of the United States (HTSUS),[2] which covers "jewelry boxes . . . and similar containers" "with outer surface of sheeting of plastics" and carries a 17.6% *ad valorem* duty.  Plaintiff argues that the product is correctly classified under subheading 4202.99.10, which covers "jewelry boxes . . . and similar containers" "wholly or mainly covered with paper" and carries a 3.4% *ad valorem* duty.  The question presented is whether the subject merchandise should be classified under subheading 4202.92, because the articles have an "outer surface of sheeting of plastics" or under subheading 4202.99, because they are "wholly or mainly covered with paper."

---

[1] SWEET HOME ALABAMA (Touchstone Pictures 2002).

[2] All citations to the HTSUS, including Chapter Notes and General Notes, are to the 2013 edition.  This version was in effect from June through December 2013, during which time Kalencom entered the subject merchandise.  *See* 19 C.F.R. § 141.69.

Plaintiff filed suit challenging Customs' decision to deny plaintiff's protests of Customs' classification under the HTSUS of the jewelry boxes.  Complaint, ECF No. 11 ("Compl.") ¶¶ 2, 4.  *See also* Joint Procedural History and Joint Statement of Undisputed Facts, ECF No. 70 ("Jnt. Stmt. Facts") ¶ 7.  The parties filed cross-motions for summary judgment addressing the proper classification of the jewelry boxes.  *See* Pl.'s Mem. in Supp. Of Pl. Mot. for Summ. J., ECF No. 50 ("Pl. Br.") at 1; Mem. in Opp'n. to Pl.'s Mot. For Summ. J. and in Supp. of Def. Cross-Mot. for Summ. J., ECF No. 61 ("Def. Br.") at 1.  *See also* Pl.'s Opp. to Def. Cross-Mot. for Summ. J., ECF No. 66 ("Pl. Resp. Br.") at 1; Reply Mem. in Supp. of Gov. Cross-Mot. for Summ. J., ECF No. 68 ("Def. Reply Br") at 1.  This Court has jurisdiction under 28 U.S.C. § 1581(a) (2012), which provides that "[t]he Court of International Trade shall have exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under 19 U.S.C. § 1515."  For the following reasons, the court determines that the jewelry boxes are correctly classified under subheading 4202.92.90.

## BACKGROUND

From June to December 2013, Kalencom imported into the United States 16 entries of different styles of jewelry boxes.  The subject merchandise consists of jewelry boxes covered in one of three different types of covering material: Skivertex®, Metal-X®, or Pellaq®.  Jnt. Stmt. Facts ¶ 12.  These types of covering material generally function as "the exterior covering or wrap of a large variety of items, including books, packaging . . . menus, [and] photo albums."  Def. Ex. 6 (Deposition of Jeffrey Hopkins) ("Hopkins Dep.") at 29:22-25.  One of the key features of these types of covering

material is their durability.  *Id.* at 43:9-16.  However, customers also seek out the visual

effect, which is created based on the material's color, gloss and embossing.  Jnt. Stmt.

Facts ¶ 17.  The coating process along with the saturation together form a single look,

which also has a protective function.  *Id.* ¶ 48.

These types of covering material are grouped into three "series," each defined by

different colors and features.  *Id.* ¶ 19.  Series 1 type of covering material undergoes an

embossing process; a roller, with heat and pressure, makes imprints on the covering

material.  *Id.* ¶¶ 19, 51.  The Series 2 type "feature[s] varied ink patterns and then

embossing."  *Id.* ¶ 19.  The Series 3 type is embossed and then "tipped."  The

embossing creates indentations that result in "peaks" and "valleys," and then the

covering material is "tipped," whereby ink is applied only to the peaks created by the

embossing.  *Id.* ¶ 61, 62.  Skivertex® is available in Series 1, 2 and 3, while Metal-X® is

available only in Series 1 and Pellaq® is available only in Series 3.  *Id.* ¶ 19.

Each of the three series of covering material consists of base paper applied with

three layers of coating and additives (altogether, hereinafter the "constituent

ingredients") and are manufactured through the same process.  *Id.* ¶ 20.  First, wood

pulp is refined or formed into base paper.  *Id.* ¶ 22.[3]  The base paper is then saturated

in an acrylic polymer dispersion, comprised of polymers dispersed in water as well as

additives, including clay, colorants and fixatives.  *Id.* ¶¶ 24 - 25.  Afterward, the

---

[3] The base paper for Skivertex® and Pellaq® is approximately 0.24mm thick.  Jnt. Stmt.
Facts ¶ 23.  The base paper for Metal-X® is approximately 0.1651mm or 0.1778mm
thick.  *Id.* ¶ 23.

saturated base paper is then heated to remove the water in the dispersion so that only the polymers and additives remain.  *Id.* ¶ 31.

Next, the coating is created through a three-step process.  The three steps result in three layers stacked on top of each other.  Each step involves the use of acrylic based products.  *Id.* ¶ 24.  In the first step, one side of the impregnated base paper is applied with a bond coating that ensures that future layers of coating stay on top of the base paper rather than seep into it.[4]  *Id.* ¶ 35.  The main component of the bond coating consists of acrylic polymers dispersed in water, which contain additives such as defoamers and surfactants.  *Id.* ¶ 36.  Defoamers prevent "foaming" (the formation of bubbles that ruin the visual quality of the covering material) and other defects while surfactants help even out the bond coating.  *Id.*  The bond coating is then dried in a heated oven to remove all water, leaving the polymers and additives on one side of the covering material.  *Id.* ¶ 37.

At this point, a coating of starch that acts as a glue is then added to the back side of the covering material.  *Id.*  This coating process is the only step that involves the back side of the covering material.  The back side is ultimately affixed to the box and is not part of the outward facing side of the covering material.

The second step for the front side is called color coating and provides the covering material with "hide."[5]  Color coating provides opacity and "hides" the base paper from sight.  *Id.* ¶ 42.  Applied on top of the bond coating, this layer consists of

---

[4] The bond coating is approximately 0.01mm thick.  Jnt. Stmt. Facts ¶ 37.
[5] The color coating is approximately 0.04mm thick.  *Id.* ¶ 40.

acrylic polymers dispersed in water and additives such as colorants, defoamers, and surfactants.  *Id.* ¶ 38.  The additives make the color coating merge smoothly with the other coatings and prevent foaming.  *Id.*  Once the color coating is applied, the covering material again goes through a heated dryer to remove all water, leaving only the acrylic polymer and the additives in the color coating.  *Id.* ¶ 39.

The third step leads to the creation of the top coat — also known as the top layer — which prevents the color from rubbing off and provides abrasion resistance.[6]  *Id.* ¶ 45.  Applied above the color coating, the top coat consists of acrylic polymers dispersed in water and additives such as silicone oil, defoamer, surfactants and waxes.  *Id.* ¶ 44.  The silicone oil and waxes provide the covering material with "slip," allowing the material to slide off another slippery material.  *Id.*  After the top coat is applied, the covering material is dried to remove water from the top coating, leaving only the acrylic polymer and the additives in the top coat.  *Id.* ¶ 45.

The three-step coating process is not the end; the covering material undergoes a final processing, which varies by series.  Series 1 covering material must go through an embossing process.  *Id.* ¶ 50.  Series 2 covering material must go through two additional steps after the top coat is applied.  In the first step, an ink pattern is printed on top of the top coat.  *Id.* ¶ 57.  The ink used is the same material used to make the top coat, augmented with some additional pigment.  *Id.*  In the second step, the covering material is embossed.  *Id.* ¶ 58.  Series 3 covering material must also go through two additional steps after the top coat is applied.  In the Series 3 first step, the covering

---

[6] The top coat is approximately 0.004mm thick.  *Id.* ¶ 43.

material is embossed to create indentations or "valleys" in the material.  *Id.* ¶ 61.  The

ink used for Pellaq® "consists of a 100% solids formulated mixture continuing [sic]

short-chained polymers (acrylic chemistry and possibly others), pigments, and

additives."  *Id.* ¶ 63.[7]

## STANDARD OF REVIEW

United States Court of International Trade ("USCIT") Rule 56 permits summary

judgment when "there is no genuine dispute as to any material fact . . . ."  USCIT R.

56(a).  The court will grant summary judgment if "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law.  *Id.*  "'[I]f the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine

issue as to any material fact . . .,'" then summary judgment is appropriate.  *Essex Mfg.*

*v. United States*, 30 CIT 1, 3 (2006) (quoting USCIT R. 56(c)).  "A genuine factual

dispute is one potentially affecting the outcome under the governing law."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Because there are no material facts

disputed in this case,[8] summary judgment is appropriate.

This Court reviews classification cases *de novo*.  *See* 28 U.S.C. § 2640(a)(1).

"[I]n cases contesting the denial of a protest, the court makes its findings of fact *de novo*

---

[7] According to the covering materials' manufacturer, this ink is an acrylic polymer.  Jnt.
Stmt. Facts ¶ 63.
[8] The court concludes that the parties' joint statement of undisputed facts covers all
material facts relevant to the classification of the subject merchandise.

based upon the record made before the court, 28 U.S.C. § 2640(a)."  *Lerner New York,*

*Inc. v. United States*, 908 F. Supp. 2d 1313, 1317 (CIT 2013).

This Court independently determines the correct classification of the subject

merchandise.  "The plaintiff has the burden of establishing that the government's

classification of the subject merchandise was incorrect . . . ."  *Lerner New York*, 908 F.

Supp. 2d at 1317-8.  "[The plaintiff] does not bear the burden of establishing the correct

classification; instead, it is the court's independent duty to arrive at 'the correct result' . .

. . "  *Id*. (citations omitted).  Further, "all evidence must be viewed in the light most

favorable to the nonmoving party, and all reasonable factual inferences should be

drawn in favor of the nonmoving party."  *Dairyland Power Coop. v. United States*, 16

F.3d 1197, 1202 (Fed. Cir. 1994) (citations omitted).

Merchandise is to be classified based on the condition in which it is imported.

*See Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994).  A two-

step process guides the court in determining the proper classification of merchandise.

*Sports Graphics, Inc. v. United States*, 24 F.3d 1390, 1391 (Fed. Cir. 1994).  First, the

court must determine the meaning of "relevant tariff provisions."  *Faus Group, Inc. v.*

*United States*, 581 F.3d 1369, 1371 (Fed. Cir. 2009).  This is a question of law.  Next,

the court must determine "whether the merchandise at issue falls within a particular tariff

provision as construed."  *Id.* at 1371-2.  This is a question of fact.  "[W]hen there is no

dispute as to the nature of the merchandise, then the two-step classification analysis

'collapses entirely into a question of law.'"  *Link Snacks, Inc. v. United States*, 742 F.3d

962, 965–66 (Fed. Cir. 2014) (quoting *Cummins Inc. v. United States*, 454 F.3d 1361,

1363 (Fed. Cir. 2006)).  As there is no dispute over material facts here, the court need

consider only the first step.

## LEGAL FRAMEWORK

The General Rules of Interpretation ("GRIs") of the HTSUS govern the proper

classification of merchandise entering the United States.  Codified at 19 U.S.C. § 1202,

the HTSUS has the force of statutory law.  *Aves. In Leather, Inc. v. United States*, 423

F.3d 1326, 1333 (Fed. Cir. 2005).  The GRIs "are applied in numerical order."  *ABB, Inc.*

*v. United States*, 421 F.3d 1274, 1276 n.4 (Fed. Cir. 2005).  GRI 1 states that

"classification shall be determined according to the terms of the headings and any

relative section or chapter notes."  GRI 1.  Both tariff classifications at issue in this case

fall under the same heading.  Accordingly, GRI 6, which concerns subheadings, guides

the analysis.  Under GRI 6, "the classification of goods in the subheadings of a heading

shall be determined according to the terms of those subheadings and any related

subheading notes and, *mutatis mutandis*, to the above rules, on the understanding that

only subheadings at the same level are comparable."  Further, "the relative section,

chapter and subchapter notes also apply, unless the context otherwise requires."  GRI

6.

Absent contrary legislative intent, HTSUS tariff terms are to be understood

according to their common and commercial meanings.  *See Len-Ron Mfg. Co. v. United*

*States*, 334 F.3d 1304, 1309 (Fed. Cir. 2003).  When interpreting a tariff term, the court

may rely on its own understanding of the term and on secondary sources such as

scientific authorities and dictionaries.  *See North Am. Processing Co. v. United States*, 236 F.3d 695, 698 (2001).

The court may also refer to the Explanatory Notes to the Harmonized Commodity Description and Coding System, developed by the World Customs Organization (WCO) ("ENs").  Though the ENs are not binding on the court, they may guide the interpretation of a tariff term since they are "intended to clarify the scope of HTSUS subheadings and to offer guidance in their interpretation."  *Len–Ron Mfg. Co.*, 334 F.3d at 1309. Although not binding, the ENs are "generally indicative of the proper interpretation of a tariff provision."  *Degussa Corp. v. United States*, 508 F.3d 1044, 1047 (Fed. Cir. 2007).

## DISCUSSION

First, the court sets out the competing tariff provisions at issue in this case. Second, the court discusses the parties' contentions: the case of the United States ("defendant") for subheading 4202.92.90 and plaintiff's case for subheading 4202.99.10. Third, the court proceeds to the classification of the goods.  In this respect, the court begins by considering the question of the "outer surface" — or, precisely what is on the exterior, facing outward — of the jewelry boxes.  After finding that the three coating layers, in their entirety, are properly considered the outer surface of the jewelry boxes, the court analyzes whether the outer surface is comprised of "plastics," and, whether, as such, it constitutes a "sheeting of plastics" within the meaning of subheading 4202.92.90.  Because the court determines that the outer surface of the jewelry boxes constitutes a sheeting of plastics, the goods are properly classified under subheading 4202.92.90.  Subheading 4202.99.10, by its own language, omits jewelry boxes with an

outer surface of sheeting of plastics, so no further consideration of this tariff provision is

necessary.  Accordingly, the court sustains Customs' classification.

## I.      Competing Tariff Provisions

Chapter 42 of the HTSUS covers "articles of leather; saddlery and harness; travel

goods, handbooks and similar containers; articles of animal gut (other than silkworm

gut)."  In determining the classification of the subject merchandise, the parties agree

that the products are appropriately classified under Heading 4202 of the HTSUS, which

covers:

> Trunks, suitcases, vanity cases, attache cases, briefcases, school satchels,
> spectacle cases, binocular cases, camera cases, musical instrument cases, gun
> cases, holsters and similar containers; traveling bags, insulated food or beverage
> bags, toiletry bags, knapsacks and backpacks, handbags, shopping bags,
> wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports
> bags, bottle cases, jewelry boxes, powder cases, cutlery cases and similar
> containers, of leather or of composition leather, of sheeting of plastics, of textile
> materials, of vulcanized fiber or of paperboard, or wholly or mainly covered with
> such materials or with paper.

However, the parties disagree on the proper subheading of the subject merchandise.

Heading 4202 is first divided by the type of product: (1) "[t]runks, suitcases, vanity

cases . . . and similar containers;" (2) "[h]andbags . . .;" (3) "[a]rticles of a kind normally

carried in the pocket or in the handbag;" or, (4) "[o]ther."  At the 6-digit subheading level,

the "[o]ther" category of Heading 4202 is divided according to the composition of the

product's "outer surface."

Defendant seeks classification of the jewelry boxes under subheading 4202.92,

which covers products "with outer surface of sheeting of plastics or of textile materials."

Plaintiff seeks to have the subject merchandise classified under subheading 4202.99,

which is the "other" provision.  This provision covers merchandise that does not fit into

one of the other subheadings — specifically, that which is made "[o]f materials (*other*

*than* leather, composition leather, sheeting of plastics, textile materials, vulcanized fiber

or paperboard) *wholly or mainly covered with paper*."  Subheading 4202.99 (emphasis

supplied).

## II.      Positions of the Parties

As noted, defendant claims that the subject merchandise should be classified

under subheading 4202.92.90, because it is comprised of jewelry boxes with an outer

surface of sheeting of plastics.  Def. Br. at 13-14.  "Specifically, the boxes each have

[sic] a covering material as its exterior surface and that covering material exhibits, on its

outer surface, a continuous film of plastic, which is very thin compared to its length and

breadth."  *Id.* at 13.  Defendant argues that the outer surface is comprised of plastics

because "all of the elements of the HTSUS definition of 'plastic' are satisfied by the

ingredients and process used to create [the covering material] — the materials that

make up the outer surface."  *Id.* at 21-22.  With respect to sheeting, defendant relies on

dictionary definitions to rebut plaintiff's claim that "sheeting" must have a specific

thickness.  *Id.* at 26-29.  To the contrary, defendant argues, thickness may be used to

differentiate between plastic "sheeting" and "film," but no authority supports the

existence of a specific, absolute thickness requirement.  *Id.*  Further, defendant argues

that the outer surface is comprised of plastics because the ENs to Chapter 39 state that

plastics with non-plastic ingredients are still considered to be plastics despite the

presence of those non-plastics.  *Id.* at 19-21.  For all of these reasons, according to

defendant, the subject merchandise is appropriately classified as jewelry boxes with an

outer surface of sheeting of plastics.

Plaintiff claims that the subject merchandise should be classified under

subheading 4202.99.10 as "jewelry boxes" that are "wholly or mainly covered with

paper".  Pl. Br. at 4.  Plaintiff argues against classification in subheading 4202.92 on the

basis that the "outer surface" of the subject merchandise is neither "sheeting" nor made

"of plastics", as provided in subheading 4202.92.  *Id.* at 12-18.  According to plaintiff, the

top coating, plaintiff claims, "is disqualified as a 'sheeting of plastic' [sic] . . . because it

is not a *continuous* sheet of plastic."  *Id.* at 14 (emphasis supplied).  Plaintiff also

introduces dictionary definitions of "sheeting" to support the proposition that "sheeting"

must have a thickness of at least 0.25mm.  *Id.* at 6-7.  In the case of the subject

merchandise, because the top layer is less than 0.25mm thick, plaintiff argues that this

layer does not constitute sheeting within the meaning of subheading 4202.92.90.  *Id.* at

14.  Further, plaintiff argues that the top layer is not comprised of "plastics" due to the

presence of non-plastic materials.  *Id.* at 15.  In sum, plaintiff argues that "the coverings

of these boxes, taken as wholes, are articles of paper, and do not constitute 'sheeting of

plastic' [sic].  The chief ingredients of the assemblies are the papers . . .  As such, they

are not 'sheeting of plastic [sic].'"  *Id.* at 20.

III.   **Classification of the Subject Merchandise**

The court has an independent responsibility to determine the proper classification

of the product," *Lerner New York*, 908 F. Supp. 2d at 1317-18, and the GRIs guide the

court's analysis.  GRI 1 provides that "classification shall be determined according to the

terms of the headings and any relative section or chapter notes."  The parties agree that

the subject merchandise constitutes "jewelry boxes" with covering material on their

exterior.  Jnt. Stmt. Facts ¶ 12.  Since Heading 4202 explicitly covers "jewelry boxes,"

Heading 4202 covers the product.  Classification thus hinges on interpreting GRI 6 to

determine the proper subheading for the merchandise at issue.

The question presented is whether the subject merchandise should be classified

under subheading 4202.92, because the articles have an "outer surface of sheeting of

plastics" or under subheading 4202.99, because they are "wholly or mainly covered with

paper."  Subheading 4202.99 specifically excludes articles such as jewelry boxes and

similar articles as designated by the heading if the "outer surface" is comprised of a

"sheeting of plastics."  Accordingly, if the court determines that the jewelry boxes have

an "outer surface of sheeting of plastics," consistent with subheading 4202.92, that is

the end of the inquiry and further consideration of subheading 4202.99 is unnecessary.

To determine whether subheading 4202.92 accurately characterizes the subject

merchandise, the court must interpret each pertinent term of the subheading.  This final

step requires the court to decide: (1) which materials comprise the "outer surface;" (2)

whether the materials that comprise this outer surface, collectively, should be

considered plastics; and, (3) if the outer surface is comprised of plastics, whether the

materials consist of "sheeting of plastics."

## A.     The Question of the "Outer Surface"

To determine whether the outer surface of the merchandise qualifies as a

sheeting of plastics, the court must first decide which part of the jewelry boxes

comprises the outer surface.  The HTSUS does not define "outer surface," so the court

looks to the common meaning of these words to define the term.[9]  "Outer" is defined as

"situated or belonging on the outside," Def. Ex. 24 (WEBSTER'S NEW COLLEGIATE

DICTIONARY 808 (1979)), or "[o]f, pertaining to, or being on the outside; external . . . ."

Def. Ex. 25 (WEBSTER'S NEW INTERNATIONAL DICTIONARY UNABRIDGED, Second Edition

1732 (1955)).  Synonyms for "outer" include "exterior, external, outside [and] outward."

Def. Ex. 26 (WEBSTER'S COLLEGIATE THESAURUS 572 (1976)).  "Surface" is defined as

"[t]he exterior, external, outside [and] outward."  Def. Ex. 26 (WEBSTER'S COLLEGIATE

THESAURUS 572 (1976)).  *See also* Def. Ex. 24 (WEBSTER'S NEW COLLEGIATE DICTIONARY

1163 (defining "surface" as "the exterior or upper boundary of an object or body")).

Accordingly, the "outer surface" of an article consists of those ingredients that are

outward facing or constituting the exterior of the article.

    In this case, the jewelry boxes at issue have an "outer surface," and that outer

surface consists of the exterior of the covering material – Skivertex®, Metal-X®, or

Pellaq®.  "All of the jewelry boxes at issue are covered in one of three types of covering

material."  Jnt. Stmt. Facts ¶ 12.  The parties agree that the covering material is

"generally used as 'the exterior covering' or wrap of a large variety of items."  *Id.* ¶ 16.

Def. Ex. 6 (Hopkins Dep.) at 29:22–25.  The covering material here fulfills that same

purpose, and there is no suggestion to the contrary from either party.

---

[9] Defendant offers definitions of both "outer" and "surface," Def. Br. at 17-18, and
"[p]laintiff thoroughly agrees with the definitions offered by defendant concerning the
terms 'outer' and 'surface."  Pl. Resp. Br. at 1.

The court classifies merchandise and considers its character based on its condition at the time of importation.  *See Mita Copystar Am.*, 21 F.3d at 1082.  Here, when the goods are imported, the coating layers are indivisible, comprising a single entity: "[t]he layers of coating cannot be peeled apart or otherwise separated."  Jnt. Stmt. Facts ¶ 49.  The layers, *together*, form a "single look" and provide a single function, despite variations in the ingredients and manufacturing processes of Skivertex®, Metal-X®, or Pellaq®.  *Id.* ¶ 48.

Despite the parties' agreement that the exterior of the jewelry boxes is comprised of the covering material, *Id.* ¶ 12, plaintiff would have the court divide the covering material into its constituent layers for the purpose of analyzing what constitutes the "outer surface."  *See* Pl. Br. at 14.  Despite plaintiff's declaration that the "[t]he exterior surface would appear to be the top coat," Pl. Resp. Br. at 2, plaintiff argues that the thickness of the top coat is so "insignificant" that the top coat does not meet the requirements of subheading 7202.90.92, Pl. Br. at 13, and as a result, it is "disqualified as a 'sheeting of plastic [sic].'" *Id.* at 14.

To divide the coating layers of the covering material into constituent layers when such division is not even physically possible at the time of importation defies logic. Skivertex®, Metal-X®, or Pellaq® are themselves products — products manufactured by a third-party, Neenah Paper.  Jnt. Stmt. Facts ¶¶ 13-14.  The parties agree that the three types of covering material generally function as "the exterior covering" of items, Jnt. Stmt. Facts ¶ 14, and they fulfill that function here.  Moreover, the parties agree that despite the multi-step process, the layers added to the base paper qualify as "a coating"

— a single entity.  *Id*. ¶ 24.  Accordingly, this coating is appropriately considered the exterior of the jewelry boxes and thus it serves as the "outer surface."

### B.    Whether the Outer Surface is Comprised of Plastics

Having determined that the exterior of the covering material constitutes the outer surface of the jewelry boxes, the court turns to an analysis of whether the outer surface is comprised of plastics.  The court determines that the outer surface, in fact, consists of plastics.

The tariff term "plastic" is defined in the HTSUS.  Specifically, "plastic" is defined in Chapter 39, Note 1 as "those materials of Headings 3901 to 3914 which are or have been capable, either at the moment of polymerization or at some subsequent stage, of being formed under external influence (usually heat and pressure, if necessary with a solvent or plasticizer) by molding, casting, extruding, rolling or other process into shapes which are retained on the removal of the external influence."

Heading 3906 specifically covers "[a]crylic polymers in primary forms."  The "primary forms" of plastics include "[l]iquids and pastes, including dispersions (emulsions and suspensions) and solutions."  HTSUS Chapter 39, Note 6.  The ENs to Chapter 39 provide additional guidance regarding plastics in the "primary form" of "liquids and pastes."  Specifically, the ENs clarify the scope of the primary forms of plastics by stating that liquids "used . . .  as impregnating materials, surface coatings" may also be classified as plastics.  The ENs also state that "these liquids or pastes may contain other materials such as plasticisers, stabilisers, fillers and colouring matter, chiefly intended to give the finished products special physical properties or other

desirable characteristics."  General EN to HTSUS Chapter 39.  Accordingly, materials

consisting of non-plastic ingredients may still properly be classified as plastics despite

the presence of the other substances.

Here, the outer surface qualifies as plastics because the coatings consist of

plastics — specifically, acrylic polymers.[10]  The presence of additives does not alter this

plastic character because the Explanatory Notes specifically contemplate a composition

including non-plastic components.  *Id*.

The exterior of the covering material consists of coating layers and additives —

which are reviewed here in turn.  First, all three coating layers used to manufacture

Skivertex®, Metal-X®, and Pellaq® consist of dried acrylic polymer dispersions.  *See*

Jnt. Stmt. Facts ¶¶ 36-45.  Each of the three steps of the coating process applies acrylic

based products.  "These acrylic based products, as a general category, are referred to

as 'pigmented acrylic (water based) synthetic latex."  Jnt. Stmt. Facts ¶ 24 (quoting Def.

Ex. 8).  The heated oven drying process, in which the water in the acrylic polymer

dispersion is removed, Jnt. Smt. Facts ¶ 30-31, shows that the covering material as a

whole is capable of being "formed under external influence," another requirement to

qualify as plastics.  Since Heading 3906 specifically covers acrylic polymers in this form,

s*ee* HTSUS Chapter 39, Note 6, the covering material's exterior consists of plastics.

Based on the high concentration of plastics in the coating layers, the court,

therefore, determines that the outer surface is comprised of plastics, and this conclusion

---

[10] The base paper also — even prior to the coating process — is itself saturated in an acrylic polymer dispersion.  Jnt. Stmt. Facts ¶ 24.

is consistent with subheading 4202.92.90, notwithstanding that the dispersions used

contain non-plastic additives such as defoamers, surfactants and colorants.  However,

"[a]dditives generally constitute less than 5-10% of the total formula."  *Id.* ¶ 29.

Moreover, the General EN to Chapter 39 states that plastics in liquid or paste form "may

contain other materials such as plasticisers, stabilisers, fillers and colouring matter . . . ."

Since having a composition consisting exclusively of polymers is not a requirement for a

material to be considered "plastics" under the HTSUS, the court declines to impose

such a limitation for tariff classification purposes here.

Plaintiff contends that the "inks" used to decorate the Series 2 and Series 3

covering materials exclude them from having an "outer surface of sheeting of plastics."

Pl. Br. at 16-18.  This claim is made on the basis that "the outermost surface is . . .

covered by and consist[s] of ink."  *Id.* at 17.  The court again rejects the partition of the

covering material into different coating layers for any part of the classification analysis

because, as discussed above, the covering material is a single entity surrounding the

jewelry box.  *See* Pl. Stmt. Facts ¶ 49.  Accordingly, all aspects of the court's analysis

rely on the covering material in its entirety, rather than on a single, constituent

ingredient or layer.[11]

Determination of whether the outer surface is comprised of plastics depends on

consideration of the outer surface as a whole of the jewelry boxes.  Because the outer

---

[11] Even assuming *arguendo* that the outer surface is covered by ink, "[t]he ink used to
make Skivertex® Series 2 is essentially the same material that is used to make the top
coat, with some additional pigment."  Jnt Stmt Facts ¶ 57.  The ink itself is also an
acrylic polymer.  *Id.* ¶ 63.  The ink, therefore, does not detract from the plastic character
of the outer surface.

surface is comprised of plastics and the non-plastic ingredients do not alter the

character of the outer surface, the court determines that the outer surface is, in fact,

comprised of plastics.

> **C.      Whether the Outer Surface Constitutes a "Sheeting" of Plastics**

Having determined that the outer surface of the merchandise is comprised of

plastics, the court must determine whether the outer surface constitutes a "sheeting."

The court declines to invoke the selective conception of "sheeting" favored by plaintiff

and instead determines that the outer surface qualifies as "sheeting of plastics."

First, the court must define the term "sheeting."  Unlike plastics, sheeting is not

defined in the HTSUS, so the court looks at its common meaning for interpretation.

Relevant case law states that the common meaning of statutorily undefined tariff terms

can be determined by consulting dictionaries.  *See Sarne Handbags Corp. v. United*

*States*, 24 CIT 309, 315, 100 F. Supp. 2d 1126, 1133 (2000) ("To determine the

common meaning of a tariff term, a court may consult dictionaries, lexicons, the

testimony in the record, and other reliable sources of information").  *See also Cargill,*

*Inc. v. United States*, 28 CIT 401, 410 (2004) ("To ascertain a tariff term's common

meaning, the Court may consult dictionaries and scientific authorities, as well as its own

understanding of the term").

Dictionary sources describe "sheeting" in general as a continuous film of some

material (such as plastic), which is thin, but not limited to a specific thickness in absolute

terms.  The MERRIAM-WEBSTER ONLINE DICTIONARY defines "sheeting" as "material in the

form of sheets or suitable for forming into sheets: such as . . . material (such as a

plastic) in the form of a continuous film."  The COLLINS ONLINE DICTIONARY defines

"sheeting" as metal, plastic, or other material that is made in the form of sheets."

"Sheet" is defined in FUNK & WAGNALLS NEW INTERNATIONAL DICTIONARY OF THE ENGLISH

LANGUAGE 1159 (Comprehensive Edition, 1987) as "a very thin and broad piece of any

substance; that which is or can be spread, as upon a surface, or can be laid in broad

folds; anything having a considerable expanse with very little thickness" and in

WEBSTER'S NEW INTERNATIONAL DICTIONARY 2308 as "[i]n general, a piece of anything, or

an extent of some substance, that is usually very thin in relation to its length and

breadth."  MCGRAW HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1716 (4th Ed.

1989) defines "sheeting" as "[a] continuous film of a material such as plastic."  The

same source defines "film" as "[a] flat section of a thermoplastic resin, a regenerated

cellulose derivative, or other material that is extremely thin in comparison to its length

and breadth and has a nominal maximum thickness of .25 millimeter."  These

definitions, therefore, buttress the definition of "sheeting" as adopted in *Sarne*

*Handbags Corp.*, in which this court defined sheeting as "material in the form of or

suitable for forming into a broad surface of something that is unusually thin, or [] a

material in the form of a continuous thin covering or coating."  100 F. Supp. 2d at 1134.

Plaintiff's proposed selective conception of the meaning of "sheeting" is based on

dictionary definitions of "sheeting" which, according to plaintiff, impose a minimum

thickness requirement of 0.25mm.[12]  Pl. Resp. Br. at 3-8.  These definitions refer to

---

[12] Plaintiff also proposes that the court distinguish between "sheeting" and "film" as
different terms with different meanings.  Pl. Resp. Br. at 5-6.  Plaintiff cites the language

"sheeting" as having a thickness greater than 0.25mm.  KIRK-OTHMER ENCYCLOPEDIA OF

CHEMICAL TECHNOLOGY, VOL. 10, 216 (3rd Ed. 1980) states that:

> [a] film, as defined by the Modern Plastics Encyclopedia and as dealt with for the purposes of this article is a flat section of thermoplastic resin or a generated cellulostic material which is very thin in relation to its length and breadth and has a nominal thickness not greater than 0.25mm.  *The same materials in greater thicknesses are classified as sheets*.

(emphasis supplied).  In contrast, "[f]ilms are generally regarded as being 0.25 mm or

less, whereas sheet may range from this thickness to several centimeters thick."  KIRK-

OTHMER ENCYCLOPEDIA OF CHEMICAL TECHNOLOGY, VOL. 10, 761 (4th Ed. 1994).  In light

of this distinction, plaintiff argues that "the actual term 'plastic sheeting' (or 'sheeting of

plastics') has a common meaning, and that common meaning is as a layer of plastic

with a thickness greater than 0.25mm."  Pl. Resp. Br. at 7.

    The dictionary definitions do not purport to set out parameters as to what

qualifies as a "sheeting" in all contexts.[13]  Accordingly, the court does not find a basis to

favor this selective definition over the *Sarne* court's more general definition.  "Where a

tariff term has various definitions or meanings and has broad and narrow

interpretations, the court must determine which definition best expresses the

---

of headings outside HTSUS Chapter 42 — Headings 3919, 3920 and 3921 — all of which provide for "plates, sheets, film, foil and strip, of plastics."  Plaintiff argues that these provisions serve as evidence that sheeting and film are "separate terms."  *Id.* at 5. Notwithstanding that the headings to which plaintiff cites specifically refer to "sheets," rather than "sheeting," the court does not consider that drawing such a distinction is appropriate here, let alone necessary.  The tariff provision at issue in this case does not include the term "film."  Moreover, the inclusion of "film" in definitions of "sheeting" in multiple dictionaries suggests that the two terms are not, in fact, mutually exclusive.
[13] The KIRK-OTHMER ENCYCLOPEDIA OF CHEMICAL TECHNOLOGY specifies that the definition is "as dealt with for the purposes of *this* article," (emphasis supplied), not *any* article.

congressional intent." *Quaker Pet Group, LLC v. United States*, 42 CIT ___, ___, 287

F. Supp. 3d 1348, 1355 (2018).  Here, the court finds no evidence that the scope of the

tariff term in question was intended to be defined narrowly in the way plaintiff

proposes.[14]  In line with the *Sarne* court, the court rejects the notion that "sheeting"

must have a certain thickness and finds that "sheeting" is a relatively thin material that

can cover a broad surface area and rejects a narrower definition.

The inquiry then turns to whether the subject merchandise has "an outer surface

of sheeting of plastics."  The court finds that sheeting must be thin, continuous and wide

enough to cover a surface.  The outer surface of all three types of covering materials —

Skivertex®, Metal-X®, and Pellaq® — meet these requirements.  As discussed above,

because the coating layers are an acrylic polymer dispersion, they qualify as plastics.

The material comprising the outer surface is also continuous; since the manufacturing of

the layers results in a single, indivisible layer, it is "continuous" — not separated by any

other material.  The exterior is also thin (.054mm) relative to the length and breadth of

the jewelry boxes as a whole, Def. Ex. 11 (Ingredient List); Def. Ex. 7 (Chaney-Ryan

Dep.) at 135:9-15, and covers the entirety of the merchandise.  Therefore, the outer

surface of the merchandise is a "sheeting of plastics" as stated in subheading

4202.92.90.

---

[14] In fact, other sections of the HTSUS specifically define the scope of a tariff provision by thickness. *See* HTSUS subheading 3920.79.10 (explicitly providing for "sheets, not over 0.076mm in thickness."  No such specification is present in the subheading at issue.

Since the outer surface of the jewelry box is a sheeting of plastics, the subject merchandise may not be "wholly or mainly covered with paper," as stated in subheading 4202.99.10.  Subheading 4202.99.10 specifically *excludes* merchandise comprised of sheeting of plastics ("[o]f materials (other than … sheeting of plastics …) wholly or mainly covered in paper."  Since the merchandise at issue is comprised of a sheeting of plastics, subheading 4202.99.10 is thus inapplicable.

## CONCLUSION

In the 2009 rom-com, *The Proposal*, there are two title scenes.  The first proposal — disingenuous and sarcastic — occurs directly in front of 26 Federal Plaza, at the corner of Broadway and Thomas Street, just steps from the CIT courthouse.  In the scene, Andrew Paxton (Ryan Reynolds) turns around to Margaret Tate (Sandra Bullock), after exiting the building following an interview with immigration officer Gilbertson (portrayed with comic perfection by Denis O'Hare), and proceeds to direct her to propose to him:

Andrew: "Ask me nicely."

Margaret: "Ask you nicely, what?"

Andrew: "Ask me nicely to *marry* you, Margaret."

Margaret: "What does that *mean*?"

Andrew: "You heard me.  On your knee."

Margaret, speechless, looks around, swallows hard, extends her arm for him to assist her to kneel down: "Fine."

Andrew extends his arm.

Margaret, cell phone in one hand, purse over the other: "Does this work for you?"

Andrew, flat: "Oh, I like this.  Yeah."

Margaret, flat, speedily: "Will you marry me?"

Andrew: "No.  Say it like you mean it."

Margaret shakes her head, swallows: "Andrew?"

Andrew: "Yes, Margaret."

Margaret: "Sweet Andrew?"

Andrew: "I'm listening."

Margaret: "Will you, pretty please, with cherries on top, marry me?"

Andrew, thinks, looks around: "Okay.  I don't appreciate the sarcasm, but I'll do it. See you at the airport tomorrow."  She extends her hand for him to help her up as he turns and walks away.[15]

* * *

The court does not walk away from its obligation to decide this case.  For the foregoing reasons, summary judgment is granted in favor of defendant.  Customs' classification is upheld and judgment will be entered accordingly.

   /s/ Timothy M. Reif
Timothy M. Reif, Judge


Dated: May 18, 2020
         New York, New York

---

[15] THE PROPOSAL (Touchstone Pictures, K/O Paper Products, Mandeville Films 2009).